UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

TONYA LEE SANCHEZ

                                                  CIVIL ACTION

VERSUS

                                                  NO. 16-195-JWD-EWD

CAROLYN W. COLVIN

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on July 13, 2017.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

TONYA LEE SANCHEZ

VERSUS

CAROLYN W. COLVIN

CIVIL ACTION

NO. 16-195-JWD-EWD

## MAGISTRATE JUDGE'S REPORT

Plaintiff, Tonya Lee Sanchez ("Plaintiff"), brought this action under 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner") denying her applications for disability insurance benefits.[1] Plaintiff has filed an Opening Brief,[2] the Commissioner has filed an Opposition Memorandum,[3] and Plaintiff has filed a Reply.[4]  Based on the applicable standard of review under § 405(g) and the analysis which follows, the undersigned recommends that the Commissioner's decision be AFFIRMED.

### I.    Procedural History

Plaintiff filed an application for disability insurance benefits and supplemental security income benefits on December 4, 2012[5] alleging disability beginning October 25, 2012.[6]  Plaintiff's

---

[1] *See*, AR pp. 18-30.  References to documents filed in this case are designated by "(R. Doc. [docket entry number(s)] p. [page number(s)]."  References to the record of administrative proceedings filed in this case are designated by "(AR [page number(s)]."

[2] R. Doc. 10.

[3] R. Doc. 12.

[4] R. Doc. 13.

[5] AR pp. 125-131 & 570-575.

[6] AR p. 125.  During the May 12, 2014 hearing, Plaintiff's counsel noted "I show the onset that we had alleged was December of `10."  AR p. 610.  However, in her applications, Plaintiff alleged a disability onset date of October 25, 2012.  The ALJ's ruling sets forth that "the claimant alleged disability beginning October 25, 2012," AR p. 14, and Plaintiff has not appealed that aspect of the ALJ's ruling.

claim was initially denied on February 8, 2013,[7] and thereafter Plaintiff requested a hearing before

an Administrative Law Judge ("ALJ").[8]  A hearing was held on May 12, 2014 at which Plaintiff,

represented by counsel, testified.[9]

On October 17, 2014, the ALJ issued a notice of unfavorable decision.[10]  Thereafter,

Plaintiff requested review by the Appeals Council, and on January 20, 2016, the Appeals Council

denied Plaintiff's request for review.[11]  On March 24, 2016 Plaintiff filed her Complaint.[12]

Accordingly, Plaintiff exhausted her administrative remedies before timely filing this action for

judicial review and the ALJ's decision is the Commissioner's final decision for purposes of judicial

review.[13]

## II.     Standard of Review

Under 42 U.S.C. § 405(g), judicial review of a final decision of the Commissioner denying

disability benefits is limited to two inquiries: (1) whether substantial evidence exists in the record

as a whole to support the Commissioner's findings, and (2) whether the Commissioner's final

decision applies the proper legal standards.  *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001);

*Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  If the Commissioner fails to apply the

correct legal standards, or provide a reviewing court with a sufficient basis to determine that the

---

[7] AR pp. 45-48 & 586-589.

[8] AR pp. 49-55.

[9] The hearing was originally scheduled to take place on March 24, 2014; however, the hearing was postponed until May 12, 2014.  *See*, AR pp. 590-595 & 596-629.

[10] AR pp. 11-26.

[11] AR pp. 6-8.

[12] R. Doc. 1.

[13] *See*, 20 C.F.R. § 404.981 ("The Appeals Council may deny a party's request for review or it may decide to review a case and make a decision.  The Appeals Council's decision, or the decision of the administrative law judge if the request for review is denied, is binding unless you or another party file an action in Federal district court, or the decision is revised.  You may file an action in a Federal district court within 60 days after the date you receive notice of the Appeals Council's action.").  Per the Appeals Council's Notice, Plaintiff had sixty days following receipt of the Notice, and it was assumed that Plaintiff received the Notice 5 days after January 20, 2016.

correct legal principles were followed, it is grounds for reversal. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981); *Western v. Harris*, 633 F.2d 1204, 1206 (5th Cir. 1981); *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

### III.    The ALJ's Decision

A claimant has the burden of proving that he or she suffers from a disability, which is defined as a medically determinable physical or mental impairment lasting at least 12 months that prevents the claimant from engaging in substantial gainful activity. 20 C.F.R. §§ 404.1505; 416.905. The regulations require the ALJ to apply a five-step sequential evaluation to each claim for benefits. 20 C.F.R. §§ 404.1520; 416.920. In the five-step sequence used to evaluate claims the Commissioner must determine whether: (1) the claimant is currently engaged in substantial gainful activity; (2) the claimant has a severe impairment(s); (3) the impairment(s) meets or equals the severity of a listed impairment in Appendix 1 of the regulations; (4) the impairment(s) prevents the claimant from performing past relevant work; and, (5) the impairment(s) prevents the claimant from doing any other work. *Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002).

The burden rests upon the claimant throughout the first four steps of this five-step process to prove disability. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). If the claimant is successful at all four of the preceding steps then the burden shifts to the Commissioner to prove, considering the claimant's residual functional capacity ("RFC"), age, education and past work experience, that he or she is capable of performing other work. 20 C.F.R § 404.1520(g)(1). If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove that he or she cannot, in fact, perform that work. *Muse*, 925 F.2d at 789.

Here, the ALJ determined that Plaintiff last met insured status requirements through December 31, 2016 and had not engaged in substantial gainful activity since October 25, 2012, the

alleged onset date. The ALJ found that Plaintiff had severe impairments of "degenerative disk disease and other and unspecified arthropathies"[14] but that Plaintiff's "carpal tunnel syndrome, depression and anxiety" were not severe impairments. The ALJ further found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."[15] Based on the Plaintiff's determined limitations, the ALJ found Plaintiff had the residual functional capacity ("RFC") to

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except lift and carry 20 pounds occasionally, 10 pounds frequently, sit for 6 hours in an 8-hour workday, stand and/or walk 6 hours in an 8-hour workday, occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch, crawl; never climb ladders, ropes or scaffolds; some manipulative limitations in the upper extremities; occasionally reach overhead bilaterally and occasionally limited in gross manipulative; avoid work at unprotected heights and around moving machinery and vibrating surfaces and uneven surfaces; avoid wetness and humidity.[16]

Utilizing this RFC, the ALJ determined that Plaintiff was unable to perform any past relevant work, but that a significant number of other jobs in the national economy existed that Plaintiff could perform such that as of the alleged onset date (October 25, 2012) through the date of the ALJ's decision (October 17, 2014), Plaintiff was not disabled.

### IV.    Plaintiff's Allegations of Error

Plaintiff asserts two allegations of error. First, Plaintiff argues that the ALJ did not give appropriate weight to the opinion of her psychiatrist, Dr. Kumari Moturu, and, as a result, the ALJ's RFC determination failed to account for Plaintiff's mental limitations.[17] Second, Plaintiff

---

[14] AR p. 16.

[15] AR p. 23.

[16] AR p. 19.

[17] R. Doc. 10, pp. 5-7

argues that the ALJ erred in her evaluation of Plaintiff's credibility with respect to Plaintiff's testimony about the intensity, persistence, and limiting effects of her alleged pain.

## V.    Law and Analysis

### a.    Weight Given to Dr. Moturu's Opinion

Plaintiff first saw Dr. Moturu, a psychiatrist, on December 15, 2011 and saw him a total of five times prior to her alleged disability onset date of October 25, 2012.[18]  Following her alleged disability onset date, Plaintiff saw Dr. Moturu one additional time, on March 13, 2013 and thereafter transferred her mental health care to a different psychiatrist, Dr. Vatsavayi.[19]  On May 27, 2014, more than a year after Plaintiff's last visit with him, Dr. Moturu completed a Medical Source Statement of Ability to Perform Work-Related Activities (Mental) (the "MSS").[20]  Therein, Dr. Moturu checked boxes indicating whether Plaintiff had restrictions in a variety of activities using the choices of "none," "mild," "moderate," or "marked," and checked boxes indicating that Plaintiff more probably than not was of sub average intellect and would be unable to perform full time work without an unacceptable rate of absenteeism.  Plaintiff argues that the ALJ erred by giving Dr. Moturu's opinion "very little weight."[21]

### i.    Plaintiff's Mental Health Treatment Notes

Notes from Plaintiff's December 15, 2011 initial evaluation with Dr. Moturu reflect that Plaintiff presented with the chief complaints of "very bad anxiety" and panic attacks.[22]  On mental

---

[18] AR pp. 547-553.

[19] Because Plaintiff has alleged that the ALJ erred in the weight assigned to Dr. Moturu's opinion, and the weight assigned to Dr. Moturu's opinion is based, *inter alia*, on Dr. Moturu's treatment history and pattern of care, this recommendation includes discussion of all of Dr. Moturu's treatment records, including those occurring prior to the alleged disability onset date.

[20] AR pp. 564-566.

[21] AR p. 18.

[22] AR p. 551.

status exam, Plaintiff was noted as having a disheveled appearance, normal speech, anxious affect, and depressed mood.[23]   Plaintiff also was noted as fully oriented with critical judgment and irrational thought process.[24]   Plaintiff returned to Dr. Moturu on January 12, 2012.[25]   At that time, Plaintiff presented with "fair hygiene," normal speech, appropriate affect, and euthymic mood.[26] She was fully oriented and her judgment was recorded as critical, with appropriate insight, organized thought process, and relevant thought content.[27]   On April 11, 2012, Dr. Moturu noted Plaintiff's pressured speech and anxious mood and affect.[28]   Dr. Moturu further noted Plaintiff exhibited critical judgment with irrational thought process, relevant thought content, and was fully oriented.[29]   On June 18, 2012, Dr. Moturu noted on mental status exam that Plaintiff exhibited fair hygiene, normal speech and appropriate affect, euthymic mood, logical judgment, appropriate insight, organized thought process, relevant thought content, and was fully oriented.[30]   On October 11, 2012, Dr. Moturu noted Plaintiff presented with a disheveled appearance, but exhibited normal speech, appropriate affect, euthymic mood, logical judgment, appropriate insight, organized thought process, relevant thought content, and was fully oriented.[31]   Following the alleged October 25, 2012 onset of disability, Plaintiff saw Dr. Moturu one additional time, on March 13, 2013.[32]

---

[23] AR p. 552.

[24] *Id*.

[25] AR p. 550.

[26] *Id*.

[27] *Id*.

[28] AR p. 549.

[29] *Id*.

[30] AR p. 548.

[31] AR p. 547.

[32] AR p. 557.

Other than noting that there was no evidence of suicidal ideation, the progress note from the March 13, 2013 visit does not include any observations from any mental status exam.[33]

On June 18, 2013, Plaintiff saw Dr. Vatsavayi for an initial psychiatric evaluation.[34] Notes from this initial exam reflect that Plaintiff reported a ten year history of depression and panic attacks, and that Cymbalta helped with depression.[35] On mental status exam, Plaintiff was noted to have a pleasant appearance, with speech within normal limits, average intelligence, and normal thought process.[36] Dr. Vatsavayi added Adderall and instructed Plaintiff to continue with Cymbalta and Xanax.[37] Plaintiff saw Dr. Vatsavayi again on August 1, 2013.[38] Progress notes from that visit indicate that Plaintiff reported that she was frustrated with her medical issues, but that she was sleeping well and her anxiety was in good control.[39] Plaintiff's mental status exam notes Plaintiff was appropriately groomed, exhibited full affect, fair insight and judgment, a normal speech rate and volume, logical thought process, and intact orientation.[40] At that visit, Dr. Vatsavayi continued Plaintiff's medications of Cymbalta, Xanax, and Adderall.[41] The last progress note from Dr. Vatsavayi included in the administrative record is from November 5, 2013.[42] At that time, Plaintiff complained of fatigue, depression, and pain, with complaints of

---

[33] AR p. 557. The portion of the Progress Note setting out mental status exam considerations and providing various assessments of mental functioning is left blank.

[34] AR pp. 485-487.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] AR p. 484.

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] AR p. 483.

greater pain based on weather.[43]  Plaintiff's November 5, 2013 mental status exam notes Plaintiff was appropriately groomed, exhibited full affect, fair judgment and insight, euthymic mood, normal speech rate and volume, logical thought process, and intact orientation.[44]  Dr. Vatsavayi continued her medications of Xanax, Adderall, and Cymbalta.[45]

On May 27, 2014, more than one year after Plaintiff's last visit, Dr. Moturu completed the MSS.[46]  Therein, Dr. Moturu noted that Plaintiff had no limitations in her ability to remember locations and work-like procedures; understand, remember, and carry out simple or detailed instructions; make judgments on simple work-related decisions; interact appropriately with the public; accept instruction and criticism from supervisors; be aware of normal hazards; ask simple questions or request assistance; maintain neatness and cleanliness; and maintain socially appropriate behavior.  Dr. Moturu noted that Plaintiff had marked difficulties in maintaining concentration and attention for periods of time and moderate difficulties in getting along with co-workers without unduly distracting them; responding to changes in routine work settings; performing activities within a schedule; sustaining an ordinary routine without special supervision; working with others or nearby without being distracted by them; and completing a normal workday without interruption from psychologically based symptoms.  Dr. Moturu checked the "yes" box in response to the question "do you feel that it is more probably [sic] than not that he/she is of subaverage intellect" and "no" in response to the question "[d]o you feel that this individual would

---

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] AR pp. 564-566.   The MSS utilizes the following definitions with respect to potential limitations: (1) "none" – "no limitations;" (2) "mild" – "only a minimal limitation; does not significantly affect the individual's ability to function. Accordingly, the individual is capable of usefully and consistently performing the activity;" (3) "moderate" – "more that mild and less than marked.  The individual's capacity to perform the activity is significantly impaired;" and (4) "marked" – "the individual cannot usefully perform or sustain the activity."  AR p. 564.

be capable of performing full-time…remunerative, competitive employment on a day-to-day, sustained basis, that is, without an unacceptable rate of absenteeism?"[47]

### ii. The Treating Physician Rule

The ALJ gave "little weight" to Dr. Moturu's opinion.[48]  In so finding, the ALJ discussed Dr. Vatsavayi's more recent progress notes and explained that "the claimant has not seen [Dr. Moturu] since March 2013, and prior to that in October 2012.  The undersigned finds there is no consistent treatment relationship between the claimant and Dr. Moturu to support this opinion."[49]

Generally, the "opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability."  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *see also* 20 C.F.R. § 404.1527(c)(1) (examining physician opinion given more weight than non-examining physician).[50]  However, an ALJ may reject the treating source's opinion when "'there is competing

---

[47] AR p. 566.  Full-time employment was clarified to be eight hours a day, five days per week.  The MSS noted that "[m]ost employers consider absenteeism of two or more days a month to be unacceptable." AR p. 566.  Although Dr. Moturu's MSS appears to set forth an opinion regarding Plaintiff's capability to perform full-time work, "some opinions by physicians are not medical opinions, and as such have no 'special significance' in the ALJ's determination." *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (quoting 20 C.F.R. § 404.1527(e) & (e)(3)). "Among the opinions by treating doctors that have no special significance are determinations that an applicant is 'disabled' or 'unable to work.'  These determinations are legal conclusions that the regulation describes as 'reserved to the Commissioner.'"  *Frank*, 326 F.3d at 620 (quoting 20 C.F.R. § 404.1527(e)(1)).

[48] AR p. 18.

[49] AR p. 19.  Plaintiff argues that rather than give Dr. Moturu's opinion controlling weight, the ALJ instead improperly relied on "the opinion of a non-treating state agency psychological consultant."  R. Doc. 10, pp. 6-7.  While the ALJ did give "significant weight" to the opinion of Dr. Kelly Ray, a state agency psychological consultant, AR p. 18, the ALJ's decision does not discount Dr. Moturu's opinions because they are contrary to Dr. Ray's.  Instead, as discussed herein, the ALJ questioned Dr. Moturu's consistency of care and noted Plaintiff's psychological status as recorded more recently by Dr. Vatsavayi when determining the weight to be afforded to Dr. Moturu's opinion.

[50] For claims filed on or after March 27, 2017, the federal regulations provide:

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical

first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another.'" *Walker v. Barnhart*, 158 Fed. Appx. 534, 535 (5th Cir. 2005) (quoting *Newton*, 209 F.3d at 458). If the ALJ's decision is supported by substantial, contradictory, first-hand evidence from another physician, the ALJ is "not required to go through all six steps in *Newton* [because] . . . the ALJ is responsible for resolving conflicts in the evidence, and we will not substitute our judgment for his." *Cain v. Barnhart*, 193 Fed. Appx. 357, 360 (5th Cir. 2006) (citing *Newton*, 209 F.3d at 452, 458; *Walker*, 158 Fed. Appx. at 534)). Further, "the ALJ may give 'less weight, little weight, or even no weight' to the opinion of a treating physician upon a showing of good cause." *Ray v. Barnhart*, 163 Fed. Appx. 308, 313 (5th Cir. 2006) (quoting *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001)). In summary, an ALJ is free to discredit the opinion of a treating physician when it is contradicted by the evidence in the record. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (ALJ may reject a treating physician's opinion in favor of an examining physician where the evidence supports a contrary conclusion). Where an ALJ has found a treating physician's opinion to be inconsistent with that physician's own treatment records and other evidence in the record, this court has affirmed the ALJ's rejection of that opinion. *See*, *Villar v. Colvin*, Civil Action No. 14-562, 2015 WL 7731400 (M.D. La. Oct. 8, 2015) (affirming ALJ's rejection of treating physician's opinion where physician's own notes and other notes in the record failed to support the physician's opinion); *Miller v. Colvin*, Civil Action No. 14-675, 2016 WL 1178391, at * 4 (M.D. La. Feb. 25, 2016) (affirming ALJ's decision to afford

---

findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section). We will articulate how we considered the medical opinions and prior administrative medical findings in your claim according to paragraph (b) of this section.

20 C.F.R. § 404.1520c. Because this claim was filed prior to March 27, 2017, the treating physician rule set forth in 20 C.F.R. § 404.1527 controls.

little weight to treating psychiatrist's Mental Medical Source Statement where Statement was unsupported by psychiatrist's own treatment notes).[51]

Here, the ALJ explicitly found there was "no consistent treatment relationship between the claimant and Dr. Moturu to support" Dr. Moturu's opinion.[52]  Under the regulations, a "treating source" is defined as a medical source that has or has had "an ongoing treatment relationship" such that the medical evidence shows that Plaintiff sees or has seen "the source with a frequency consistent with accepted medical practice for the type of treatment."  20 CFR § 404.1502. Opinions from treating sources are generally given more weight "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's impairments.  20 CFR § 404.1527(c)(2).  Where no such longitudinal pattern of care is shown, the Fifth Circuit has held that an ALJ is not required to give that professional's opinion greater weight. *See*, *Clayborne v. Astrue*, 260 Fed. Appx. 735, 737 (5th Cir. 2008) (doctor properly rejected as treating source where "isolated visits" did not amount to an "ongoing treatment relationship" with doctor); *Hernandez v. Heckler*, 704 F.2d 857, 860–61 (5th Cir. 1983) (doctor who only saw claimant twice in a 17–month period was not a treating physician); *Taylor v. Astrue*, 245 Fed. Appx. 387, 391 (5th Cir. 2007) ("[N]othing about Taylor's relationship with Dr. Weisberg

---

[51] To the extent Plaintiff contends that the ALJ was required to perform a detailed analysis of Dr. Moturu's opinion under the criteria set forth in 20 C.F.R. § 404.1527(d)(2), R. Doc. 10, p. 6, the Fifth Circuit has explained that "*absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist*, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Newton v. Apfel*, 209 F.3d 448, 454 (5th Cir. 2000) (emphasis added).  Because both Dr. Moturu's own treatment notes, as well as those from Dr. Vatsavayi controvert the limitations purportedly set forth in the MSS, the ALJ was not required to specifically analyze the 20 C.F.R. § 404.1527(d)(2) criteria.  *Holifield v. Astrue*, 402 Fed. Appx. 24, 27 (5th Cir. 2010) ("This court has interpreted 20 C.F.R. § 404.1527(d)(2) to mean that, 'absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2).' Since the record is replete with reliable medical evidence controverting Dr. Purser's opinions, the ALJ had no obligation to perform a detailed analysis before rejecting his opinions.") (citing *Newton*).

[52] AR p. 19.

establishes the 'longitudinal' pattern of care described in [the regulations]; Taylor's two visits to Dr. Weisberg, four years apart, are the sort of "individual examinations" that are distinguished ... from the continuous care provided by a treating physician.").  Dr. Moturu saw Plaintiff five times in the 10 month period prior to the alleged disability onset date, but only once after.  Further, given the more than one year delay between Dr. Moturu's last treatment record and the MSS, it is not clear Dr. Moturu meets the definition of a treating physician, and the ALJ appropriately considered the time period between Plaintiff's last visit with Dr. Moturu and the MSS.[53]

Whether or not Dr. Moturu is considered a treating physician, Plaintiff's more recent treatment records from Dr. Vatsavayi, which reflect positive mental status exams indicating Plaintiff's improved mental state, provide substantial evidence supporting the ALJ's conclusion to give little weight to Dr. Moturu's opinions.  Further, although Dr. Moturu's own treatment records include some negative findings, those same records reflect normal speech, appropriate affect, euthymic mood, and that Plaintiff was fully oriented.[54]  Under such circumstances, it was not legal error for the ALJ to assign little weight to Dr. Moturu's opinions.  *See*, *Parker v. Astrue*, Civil Action No. 11-294, 2012 WL 5384821, at * 7 (M.D. La. Nov. 1, 2012) ("While the plaintiff pointed out several excerpts from the treatment records which he contends support [the treating physician's] restrictions [set forth in a mental residual functional capacity assessment], the same records contain other information which supports the ALJ's finding that the limitations imposed by Dr. Parsons were unsupported."); *Swan v. Colvin*, Civil Action No. 15-60, 2016 WL 5429669, at * 13 (M.D. La. Aug. 30, 2016) ("The Court finds it unnecessary to determine whether Dr. Morrison is a 'treating physician' because Dr. Morrison's November 26, 2013 Medical Source

---

[53] The Commissioner has not argued that Dr. Moturu is not a treating physician.

[54] *See*, *e.g.*, AR pp. 547, 548, and 550.

Statement is inconsistent with her treatment records and would not be entitled to substantial weight even if Dr. Morrison is a 'treating physician.' The Fifth Circuit has held that an ALJ may give less weight to a treating physician's opinion when good cause is shown, as is the case when his statement as to disability is so brief and conclusory that it lacks strong persuasive weight, is not supported by medically acceptable clinical laboratory diagnostic techniques, *or is otherwise unsupported by the evidence*.") (citing *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)) (emphasis added by *Swan* court).

### iii. The RFC Properly Reflects Plaintiff's Mental Limitations

Following her discussion of Dr. Moturu's opinion and the weight to be assigned thereto, the ALJ concluded that Plaintiff's "determinable mental impairments of affective disorder and anxiety disorder, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non-severe."[55] In making this determination, the ALJ explained that "[a]n impairment is considered not severe if it is only a slight abnormality, having such a minimal effect on the individual so that it would not be expected to interfere with the ability to do work…."[56] In determining the severity of Plaintiff's alleged mental limitations, the ALJ considered the four broad functional areas set out in Section 12.00C of the Listing of Impairments: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. 20 C.F.R., pt. 404, subpt. P, appx. 1, § 12.00(C). The ALJ determined that Plaintiff had no limitations in activities of daily living or social functioning, mild limitations in the area of concentration, persistence, or pace, and no episodes of decompensation. Other than pointing out that Dr. Moturu indicated marked

---

[55] AR p. 17.

[56] AR p. 17.

limitations in the Plaintiff's ability to maintain attention and concentration for extended periods, Plaintiff does not argue that the ALJ's determinations as to these four areas of functioning were in error.

Under the regulations, an impairment is not severe "if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a); see also 20 C.F.R. § 404.1520(c). The Fifth Circuit has construed these regulations as setting forth the following standard of non-severity: "an impairment can be considered as not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985) (internal brackets omitted) (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984) (per curiam), and citing *Martin v. Heckler*, 748 F.2d 1027, 1032 (5th Cir. 1984), and *Davis v. Heckler*, 748 F.2d 293, 296 (5th Cir. 1984) (per curiam)).

Here, the ALJ formulated the severity question in compliance with the Fifth Circuit's standard, and determined that Plaintiff's depression and affective disorder were not severe, meaning that such limitations "were expected to have no impact on [Plaintiff's] ability to work." *Stinnett v. Berryhill*, Civil Action No. 16-252, 2017 WL 1403660, at * 3 (N.D. Tex. March 31, 2017). Plaintiff argues that in forming the RFC, "the Judge should consider all of the claimant's impairments including those that may or may not be severe,"[57] however, ALJ was not required to include non-severe limitations that would not interfere with Plaintiff's ability to work in the RFC. *See*, *id*. ("As the nonsevere mental impairments would not impact [Plaintiff's] ability to work in any significant way, the RFC set out by the ALJ reflects the 12.00 paragraph B mental function analysis in finding no mental limitations."); *McNeal v. Astrue*, Civil Action No. 10-11, 2010 WL

---

[57] R. Doc. 10, p. 7.

5671198, at * 4 (N.D. Tex. Dec. 29, 2010) ("The Fifth Circuit Court of Appeals upheld a decision

that the determination of a claimant's mental RFC was not needed where the medical record did

not indicate that the claimant's mental condition rose to the level of a severe impairment.") (citing

*Brooks v. Barnhart*, 128 Fed. Appx. 344, 344 (5th Cir. 2005) ("The ALJ's determination that

Brooks did not have a severe mental impairment is supported by substantial evidence.  The medical

record did not indicate that Brooks' mental condition rose to the level of a severe impairment, and

thus, there was no need for the ALJ to order further testing to determining Brooks' residual

functional capacity in regards to her psychological problems.").

### b. Plaintiff's Credibility and Complaints of Pain

In an Adult Function Report completed by Plaintiff on December 17, 2012, Plaintiff

asserted that her medical condition limited her ability to work based on:

> extreme pain to all 4 extremities – both arms, both legs – joint pain
> – neck pain- loss of motion – lower back pain – unable to lift – loss
> of feeling in hands and feet, unable to sit or stand for long periods,
> unable to bend or squat without pain and loss of balance.[58]

Plaintiff further asserted that "most days I'm unable to get out of bed due to pain."[59]  During the

May 12, 2014 hearing, Plaintiff testified that she could no longer work because of "constant

pain."[60]  Although the ALJ found that Plaintiff's "medically determinable impairments could be

reasonably expected to cause the alleged symptoms," the ALJ found that Plaintiff's "statements

concerning the intensity, persistence and limiting effects of these symptoms are not entirely

---

[58] AR p. 167.

[59] AR p. 168.

[60] AR p. 605.  Plaintiff went on to explain "I've lost most of my feeling in my arms, and in constant – I have constant pain in my neck, my lower back.  I have – I can't – I can't think a lot.  Sometimes I forget things, but I have a lot of joint pain…and my lower back, I have a lot of pain that goes into my right leg because of the nerves being compressed…."  AR p. 606.

credible…."[61]  On appeal, Plaintiff contends that there is a lack of substantial evidence to support the ALJ's determinations regarding Plaintiff's credibility and the limiting effects of Plaintiff's purported pain.[62]

### i.    Pain as a Disabling Condition

"[P]ain can constitute a disabling impairment."  *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994).  The Fifth Circuit has held that "[p]ain constitutes a disabling condition when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment."  *Id*.  "The Commissioner has discretion to determine the disabling nature of the claimant's pain."  *Landfried v. Apfel*, 218 F.3d 743, at * 3 (5th Cir. 2000) (per curiam) (citing *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991)).  *See also*, *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987) ("While it is clear that the ALJ must consider subjective evidence of pain it is within his discretion to determine its debilitating nature.") (internal citation omitted); *Shumock v. Astrue*, Civil Action No. 12-520, 2013 WL 1289160, at * 10 (W.D. La. March 1, 2013) ("The task of weighing the evidence is in the sole province of the ALJ.  It is within the ALJ's discretion to determine the disabling nature of a claimant's pain, and the ALJ's determination is entitled to considerable deference.").  The ALJ's determination regarding the debilitating effects of pain is "entitled to considerable deference."  *Jones*, 829 F.2d at 527.  *See also*, *Johnson v. Bowen*, 864 F.2d 340, 347 (5th Cir. 1988) (same).

The Fifth Circuit has held that while an ALJ "is bound…to explain his reasons for rejecting a claimant's complaints of pain," he is not required to "follow formalistic rules in his articulation…."  *Falco*, 27 F.3d at 164.  As explained by one court:

> In making the credibility determination, the ALJ may consider a claimant's noncompliance with prescribed treatment, and a claimant's unwillingness to try all forms of relief offered.  20 C.F.R.

---

[61] AR p. 23.

[62] *See*, R. Doc. 10, pp. 8-9.

§§ 404.1530, 416.930; *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990). He may also consider the effectiveness of treatment. *Johnson v. Sullivan*, 894 F.2d 683, 686 (5th Cir. 1990). He may keep in mind a tendency on the part of a claimant to exaggerate symptoms to obtain benefits. *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987). He may discount a claimant's credibility for inconsistencies between subjective testimony and objective evidence. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Reyes v. Sullivan*, 915 F.2d 151, 155 (5th Cir. 1990). Evidence that a claimant receives only conservative treatment substantially supports an ALJ's adverse credibility finding against complaints of incapacity and severe symptoms. *Parfait v. Bowen*, 803 F.2d 810, 813–14 (5th Cir. 1986).

*Shumock*, 2013 WL 1289160, at * 10. *See also*, *Falco*, 27 F.3d at 163 ("The evidence demonstrated that, while Falco undoubtedly experienced some pain, he was able to spend a great deal of time watching television or dining with friends. Those activities are inconsistent with Falco's assertion that he could spend no more than 15-20 minutes sitting at a time. Moreover, Falco exhibited no external manifestations of debilitating pain such as marked weight loss."); *Jones v. Astrue*, Civil Action No. 11-510, 2012 WL 4325661, at * 5 (M.D. La. Sept. 20, 2012) ("assuming *arguendo* that plaintiff also meant to argue that her subjective pain should have been considered, evidence that plaintiff receives only conservative pain treatment substantially supports the ALJ's adverse credibility finding against complaints of incapacity and severe pain."); *Reyes v. Sullivan*, 915 F.2d 151, 155 (5th Cir. 1990) ("None of the cases hold that the ALJ cannot consider evidence of daily activities in conjunction with other evidence."); *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) ("While exclusive reliance upon demeanor in credibility determinations is inappropriate, it is not reversible error for an ALJ to consider demeanor as one of several factors in evaluating a claimant's credibility."). In assessing credibility, the ALJ must consider the entire record, including medical signs and laboratory findings and statements by the claimant and his or her treating or examining sources concerning the alleged symptoms and their effects. 20 C.F.R. §

404.1529(c)(1).  Additionally, the regulations provide a non-exclusive list of factors that the ALJ must consider.  *See,* 20 C.F.R. § 404.1529(c).[63]

Under the regulations and applicable legal standards, the ALJ must consider a claimant's subjective complaints, but may find that those complaints are not credible or are exaggerated.  The ALJ is not required to give subjective evidence precedence over objective evidence.  20 C.F.R. §§ 404.1529 and 416.929; 20 C.F.R. §§ 404.1527 and 416.927; Social Security Ruling 96-7p;[64] *Anthony v. Sullivan,* 954 F.2d 289, 295-96 (5th Cir. 1992); *Chambliss v. Massanari,* 269 F.3d 520, 522 (5th Cir. 2001); *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990).  Ultimately, "[t]he mere existence of pain does not automatically create grounds for disability, and subjective evidence of pain will not take precedence over conflicting medical evidence."  *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989) (citation omitted).  Likewise, an individual's statements regarding pain and other symptoms alone are not conclusive evidence of disability and must be supported by

---

[63] These factors include:

> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

[64] TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, SSR 96-7p, 1996 WL 374186.

objective evidence of a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged.  *Id.* (*quoting* 42 U.S.C. § 423(d)(5)(A)).

### ii.    Plaintiff's Medical Records

#### 1.    Records Prior to Alleged Disability Onset Date

The administrative record includes multiple medical records prior to Plaintiff's October 25, 2012 alleged disability onset date.  These records indicate that Plaintiff previously underwent a cervical fusion and thereafter, on June 16, 2009, a second surgery to remove the anterior plating system associated with the fusion procedure.[65]  Although the fusion and hardware removal initially resulted in an improvement in Plaintiff's pain symptoms, beginning in February, 2010, Plaintiff began complaining of increased pain in her neck and back and symptoms in her arms and hands.[66]  Plaintiff received epidural steroid injections on August 3, 2010 and August 24, 2010.[67]  Following these injections, Dr. Isaza rechecked Plaintiff on September 7, 2010 and noted "[a]t this time Ms.

---

[65] *See*, AR pp. 333-342.  Three weeks following removal of the anterior plating, Dr. Isaza's clinic notes indicated Plaintiff "had significant improvement in her symptoms.  She is still having dysesthesias in the left arm, but they are intermittent, and overall her pain is better."  AR p. 453.  On August 17, 2009, Dr. Isaza released Plaintiff to go back to work with no overhead activities.  AR p. 452.

[66] *See*, AR pp. 452 (February 3, 2010 clinic note from Dr. Isaza noting Plaintiff reported her neck pain was getting worse, her low back pain was worse when sitting, and prescribing Lortab along with "some exercises for the upper extremities…."); 449-450 (March 31, 2010 Dr. Isaza clinic note indicating Plaintiff reported she thinks she "might be slightly improving each day and that Dr. Isaza would "like to continue with the conservative treatment and monitor her symptoms closely and try to hold off on performing a repeat operation for as long as we can.  As long as her symptoms are manageable, we will continue on that same course."); 445-448 (Dr. Isaza June 21, 2010 clinic note wherein Plaintiff reported an increase in her back pain following a slip and fall but that arm and neck pain was better and June 23, 2010 clinic note wherein Dr. Isaza stated MRI did not reveal any evidence of acute fracture or pinched nerve and that "[s]he can take Motrin for inflammation, as well as use ice and heat for symptomatic relief.  She can continue with her stretching exercises….").

[67] AR pp. 421-429.  These injections were performed by Dr. Burdine with the Spine Diagnostic and Treatment Center.  Records from both injections include a "medical necessity" narrative section providing that "[t]he patient has failed all conservative therapy up to this point.  The patient has tried pharmacological intervention including pain medications.  Although the patient may be a surgical candidate, my patient has chosen to try interventional treatment to potentially avoid surgery."  *See*, AR pp. 422 & 427.

Sanchez's symptoms are tolerable and she is continuing to follow with Dr. Burdine….I do think that it is okay for Ms. Sanchez to return to work tomorrow at full duty…."[68]

Although Plaintiff was cleared for work on September 7, 2010, Plaintiff testified during the May 12, 2014 hearing that she quit working as a paramedic in October, 2010 "because I wasn't able to sit for long periods of time."[69]  Other than the psychiatric evaluation performed by Dr. Moturu on December 15, 2011, the administrative record does not contain another medical record until January 9, 2012, when Plaintiff saw Dr. Isaza for a recheck.[70]  Notes from that visit indicate that Plaintiff did not see Dr. Isaza sooner because she lost her insurance, and that she was complaining of "mild neck pain," "constant pain in both arms," and back pain.[71]  Dr. Isaza noted that Plaintiff was crying and obviously in pain during the appointment, and planned to get updated MRI scans.[72]

On January 16, 2012, an MRI of Plaintiff's cervical spine revealed "multilevel uncovertebral hypertrophy C3-C4, C4-C5, C5-C6 right worse than left with varying degrees of neural foraminal stenosis.  Multilevel facet arthropathy again most notable on the right at C3-C-4 and C4-C5.  Minimal grade 1 spondylolisthesis C3"[73] and the MRI of Plaintiff's lumbar spine was "essentially unremarkable" with mild spondylosis T12-L1 and minimal disc bulge L3-L4.[74]  On February 2, 2012, Plaintiff told Dr. Isaza that the Lortab was not helping, and Dr. Isaza noted

---

[68] AR p. 441.

[69] AR p. 603.

[70] AR p. 237.

[71] AR p. 237.

[72] AR p. 237.

[73] AR pp. 516-517.

[74] AR p. 518.

Plaintiff "walks very cautiously and slowly."[75]  Dr. Isaza further noted that Plaintiff's MRI "does appear fairly benign" and that Plaintiff should be evaluated by a rheumatologist.[76]

Plaintiff saw Dr. Nesheiwat, a rheumatologist, on February 28, 2012.[77]  She reported to Dr. Nesheiwat that her quality of life was bad and that she was unable to function without severe pain.[78]  Dr. Nesheiwat noted Plaintiff had normal ability to climb on the exam table and change positions smoothly, neck tenderness, and an abnormal range of motion in neck, and no decreased muscle tone in upper or lower extremities.[79]  Interpretation of Plaintiffs' films that same day indicated that Plaintiff's sacroiliac joints were unremarkable, with no evidence of ankyloses or erosions, that her bilateral hips were intact, and that while there were no fractures or bony destructive lesions on the thoracic spine, there was mild scoliotic curvature to the thoracolumbar spine and some degenerative changes.[80]  On March 14, 2012, Dr. Nesheiwat again noted that Plaintiff was able to climb on the exam table and change positions smoothly, and that she had no upper or lower extremity weakness or decreased muscle tone.[81]  Dr. Nesheiwat further opined that Plaintiff "has quite a bit of pain, which is out of proportion to her lumbar MRI findings, in the sacral region.  I feel a pain management consultation may be helpful."[82]

Plaintiff returned to Dr. Isaza on March 22, 2012, at which time Dr. Isaza increased Plaintiff's Lortab dosage, instructed her to discontinue her use of BC powder, and referred her to

---

[75] AR p. 235.

[76] AR p. 235.

[77] AR pp. 252-255.

[78] AR pp. 252-255.

[79] AR pp. 252-255.

[80] AR p. 515.

[81] AR pp. 250-251.

[82] AR pp. 250-251.

Dr. Clark for pain management.[83]  Plaintiff saw Dr. Clark on March 28, 2012, and at that time Dr. Clark noted "MRI scan dated 1-16-12 shows no significant pathology in her lumbar spine.  She also underwent x-rays of her hips and sacroiliac joints and both these are also normal.  X-rays of the thoracic spine shows a prior open reduction internal fixation of a left clavicle fracture, otherwise a mild sclerotic curve in the thoracolumbar spine with convexity to the right."[84] Although Plaintiff stated her life had been completely disrupted by her pain conditions, Dr. Clark noted Plaintiff sat still for the duration of the thirty-minute interview, rose from sitting to standing unassisted, moved easily around the exam room, and displayed a stable gait.[85]  Dr. Clark noted that Plaintiff showed reduction in her cervical range of motion and her lumbar spine, and placed her on Exalgo and Lyrica.[86]  Notes from Plaintiff's recheck with Dr. Clark on April 30, 2012, show Plaintiff experienced a "significant difference in improvement in her overall quality of life since the addition of the Exalgo…" and Dr. Clark noted the medication regime was controlling Plaintiff's lower lumbar pain and lower extremity radiculopathy, but that she was still dealing with some cervical pain.[87]  On May 7, 2012, Plaintiff received a steroid injection in her cervical region.[88]

Other than progress notes reflecting visits to her psychiatrist, the administrative record does not contain any additional medical records reflecting further treatment or follow-up prior to Plaintiff's alleged disability onset date of October 25, 2012.  The administrative record does reflect that between January 2012 and April 2012, Plaintiff took multiple safety classes and received

---

[83] AR p. 233.

[84] AR pp. 474-476.

[85] AR pp. 474-476.

[86] AR pp. 474-476.

[87] AR p. 473.

[88] AR p. 479.

additional certifications[89] and that Plaintiff was hired by Beard Construction Group, LLC ("Beard") on July 23, 2012.[90]  Plaintiff testified that she worked for Beard as a safety technician, and that her duties included inspecting construction sites for safety hazards and conducting safety training classes.[91]  She explained when working, she would remain "on the scene all day, watching the guys working and make sure that they are not violating any OSHA regulations."[92]  Plaintiff testified that she worked for Beard for three months "before I had another acute attack and was down and was – couldn't get out of the bed again."[93]  Plaintiff's last day of work with Beard was October 25, 2012[94] (*i.e.*, her alleged onset date).

### 2.  Records After Alleged Disability Onset Date

On October 28, 2012, Plaintiff presented at the emergency room, complaining of chronic neck pain.[95]  Plaintiff was ambulatory but stated that she could not lift her arms to brush her teeth.[96]  On October 29, 2012, Plaintiff returned to Dr. Isaza describing neck pain and abnormal sensation in her upper extremities.[97]  Dr. Isaza noted Plaintiff exhibited weakness in her upper extremities, recommended she be evaluated by Dr. Smith, a neurologist, to "rule out peripheral neuropathy," and "in the meantime" prescribed Mobic.[98]

---

[89] *See*, AR pp. 198-202 (Plaintiff's resume).

[90] AR pp. 146-147.

[91] AR p. 604.

[92] AR pp. 604-605.

[93] AR p. 604.

[94] AR pp. 144-145.

[95] AR p. 329-332.

[96] AR pp. 329-330.

[97] AR pp. 231-232.

[98] AR pp. 231-232.

Plaintiff saw Dr. Gawronski, a neurologist, on November 7, 2012.[99]  At that visit, Plaintiff told Dr. Gawronski that "something is not right, I want to get to the bottom of it, not just pain [management] like everybody tells me."[100]  Dr. Gawronski prescribed hydrochlororthiazide, Dexilant, Cymbalta, Vyvanse, Estradiol, and Gabapentin.[101]  On December 12, 2012, a nurse practitioner with Dr. Gawronski's practice noted Plaintiff reported that she was unable to work because of pain.[102]  At that time, Plaintiff's posture and gait was recorded as normal and her strength was rated 5/5.[103]

On January 2, 2013, Plaintiff saw Dr. Nesheiwat as well as Dr. LeBlanc, a primary care physician.  Dr. Nesheiwat noted that Plaintiff's primary complaint was pain in her joints and muscles.  Dr. Nesheiwat noted Plaintiff was able to climb onto the exam table and change positions smoothly, but that she exhibited abnormal range of motion in her neck and lumbar spine as well as lumbar spine and hip joint tenderness.[104]  Dr. Nesheiwat noted "this is new and progressive."[105]  That same day, Plaintiff saw Dr. LeBlanc, who noted a normal range of motion in Plaintiff's neck as well as normal gait and muscle strength.[106]  Dr. LeBlanc recommended a low salt diet with healthy food choices and "regular exercise."[107]  January 2, 2013 X-rays showed no acute findings on Plaintiff's sacroiliac joints.[108]

---

[99] AR pp. 304-309.

[100] AR p. 304.

[101] AR p. 309.

[102] AR pp. 401-405.

[103] AR pp. 401-405.

[104] AR pp. 246-248.

[105] AR pp. 246-248.

[106] AR pp. 315-318.

[107] AR pp. 315-318.

[108] AR p. 514.

On January 11, 2013, Plaintiff saw Dr. Nyboer, a physiatrist.[109]  Per Dr. Nyboer's notes, Plaintiff reported pain in her joints and stated that her pain was really not severe in the neck and that she could "lift with the pain that she had in the cervical region."[110]  On January 16, 2013, Plaintiff again saw Dr. Nesheiwat, who noted that Plaintiff's back pain was her biggest complaint.[111]  Dr. Nesheiwat noted Plaintiff was able to climb on the exam table and change positions smoothly, but that she exhibited abnormal range of motion in her neck and lumbar spine as well as hip joint tenderness.[112]  Dr. Nesheiwat felt her back pain was "mechanical" rather than "inflammatory" and requested CT scans of her lumbar and sacral spine.[113]  These scans indicated no fractures or malalignments of the lumbar spine, some degenerative disc disease, bilateral facet joint mild osteoarthritis at L5-S1, and a mild disc bulge at L5-S1.[114]

On February 13, 2013, Plaintiff returned to Dr. Nyboer, who noted Plaintiff had seen improvement with her pain on her current medication regime and that "[s]he is doing better with no side effects from her medication."[115]  Similarly, notes from Plaintiff's March 7, 2013 appointment at Zachary Rheumatology indicate that Plaintiff was "much worse" when out of her medication.[116]  Although Plaintiff reported weakness in her legs and trouble with her hands and difficulty holding things, her March 7, 2013 X-rays showed normal hips and hands.[117]

---

[109] AR pp. 393-400.

[110] AR p. 393.

[111] AR p. 244.

[112] AR p. 244.

[113] AR p. 244.

[114] AR p. 507.

[115] AR pp. 387-392.

[116] AR p, 496.

[117] AR pp. 511-512; AR p. 513.

Plaintiff saw Dr. Gawronski on April 2, 2013, at which time she complained of diffuse pain all over her body, difficulty brushing her teeth, trouble sleeping, and memory loss.[118] She also complained of pelvic and abdominal pain, back and joint pain, muscle cramps and weakness, stiffness, and leg pain.[119] Her gait and posture was noted as normal and her strength was recorded at 4/5.[120] Plaintiff continued to complain of pain in her arms and legs as well as pelvic pain during a visit to Louisiana Arthritis on April 4, 2013.[121] X-rays of her hands from that same day showed no acute findings.[122]

On May 8, 2013, Plaintiff reported numbness, muscle cramps, weakness, abdominal, pelvic, back and joint pain as well as memory problems to Dr. Gawronski.[123] At that visit, Plaintiff explained that "recently she was unable to point where she placed brownies, just after baking them."[124] Plaintiff returned to Dr. Gawronski on June 5, 2013.[125] Dr. Gawronski's notes from that visit indicate that an MRI of Plaintiff's brain was negative for focal/acute abnormalities, and that he suspected fibromyalgia.[126] Dr. Gawronski further noted a diagnosis of carpel tunnel syndrome and the "worsening of electrophysiological parameters over the course of approximately

---

[118] AR pp. 381-386.

[119] AR pp. 381-386.

[120] AR pp. 381-386.

[121] AR p. 495.

[122] AR pp. 509-510.

[123] AR pp. 377-380.

[124] AR p. 377.  Similarly, on May 13, 2013, Plaintiff reported to Dr. Nyboer that her memory problems were "new." AR pp. 373-376.

[125] AR pp. 505-506.

[126] AR pp. 505-506.

a year."[127]  At that visit, Plaintiff declined "occupational therapy and neurosurgical evaluation until opportunity to review her results at a follow-up."[128]

Plaintiff followed up with Louisiana Arthritis on July 9, 2013.[129]  A progress note from that visit notes that Plaintiff "saw Dr. Gawronski…referral to Houston.  Things are progressing. She has not gone back because he recommended surgery but she does not know why legs and joints are worse."[130]  On July 31, 2013, Plaintiff reported to Dr. Gawronski that her memory was better but that she was still experiencing back pain, muscle cramps, muscle weakness, and stiffness.[131]  Dr. Gawronski noted that Plaintiff's gait and posture was normal, and that her strength was 4/5.[132]

Plaintiff returned to Louisiana Arthritis on August 22, 2013 and September 13, 2013, continuing to complain of pain in her joints and loss of feeling in her feet.[133]  On November 21, 2013, she saw a nurse practitioner at the NeuroMedical Center complaining of back pain, joint pain, joint swelling, muscle cramps, muscle weakness, arthritis, leg pain at night and with exertion, numbness, frequent falls and headaches, difficulty walking, depression, anxiety, and memory loss.[134]  At that time, the nurse practitioner noted Plaintiff's gait was slow and stiff, her posture was stiff, and her strength was 4/5.[135]

---

[127] AR pp. 505-506.

[128] AR pp. 505-506.

[129] AR p. 493.

[130] AR p. 493.

[131] AR pp. 361-365.

[132] AR pp. 361-365.

[133] AR pp. 492 & 491.

[134] AR pp. 356-360.

[135] AR pp. 356-360.

On December 3, 2013, Plaintiff returned to Dr. Gawronksi.[136]  Per Dr. Gawronski's notes, Plaintiff reported that she had fallen a few days ago and was experiencing a sharp pain in her lower right extremity.   Plaintiff additionally reported that her joints swelled in cold weather.   Dr. Gawronski noted Plaintiff's severe left carpal tunnel syndrome and moderate right carpal tunnel syndrome.[137]   On January 20, 2014, Plaintiff presented to the emergency room complaining of lower abdominal pain, lower back pain, and "holding fluid in joints."[138]  Plaintiff complained of loss of function in extremities, incontinence, and worsening pain.[139]  The notes provide that "[t]he degree of onset was moderate.  The degree at present is moderate."[140]  Other than Dr. Moturu's May 27, 2014 MSS, there are no further records from Plaintiff's physicians in the administrative record.

### iii.    The ALJ's Credibility Determination

Here, while the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, the ALJ also found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely credible.[141]  In making this determination, the ALJ noted that claimant's described daily activities were "not limited to the extent one would expect, given the complaints of disabling

---

[136] AR pp. 350-355.

[137] AR p. 350.  With respect to her carpal tunnel syndrome, "[p]atient declined offer occupational therapy and neurosurgical evaluation until opportunity to review her results at follow up."  AR p. 350.

[138] AR pp. 324-328.

[139] AR p. 324.

[140] AR p. 324.

[141] AR p. 23.  In her Opening Brief, Plaintiff asserts that "[t]he Administrative Law Judge erred in the evaluation of the claimant's credibility as it related to her pain and other limiting conditions."  R. Doc. 10, p. 8.  Plaintiff does not explain what "limiting conditions," other than pain, that the ALJ erroneously evaluated.  Moreover, Plaintiff's briefing in this regard focuses on her assertion that she was "taking prescribed medications and pain relievers."  R. Doc. 10, p. 9.

symptoms and limitations."[142]  Specifically, the ALJ noted that claimant reported she was able to

take care of her personal needs without reminders and remember her appointments,[143] prepare

simple meals,[144] shop occasionally,[145] and spend her day watching television and utilizing her lap

top.[146]  The ALJ noted that Plaintiff was able to handle money,[147] occasionally drove and was able

to ride in a car,[148] visits with her children,[149] and could understand and follow written and spoken

instructions.[150]  With respect to Plaintiff's work activity (presumably with Beard), the ALJ

explained that "[a]lthough that work activity did not constitute disqualifying gainful activity, it

does indicate that the claimant's daily activities have, at least at times, been somewhat greater than

the claimant has generally reported.  Additionally, the claimant attended school for a year to get

certified as an inspector."[151]

---

[142] AR p. 23.

[143] AR p. 23.  In Plaintiff's Adult Function Report, Plaintiff checked "no" in response to the questions "do you need any special reminders to take care of personal needs and grooming" as well as "do you need help or reminders taking medicine."  AR p. 169.  Plaintiff additionally reported that "[w]hen I go to appts. I must keep a calendar of all appts and testing or I'll forget.  Memory has declined."  AR p. 171.

[144] *See*, Adult Function Report, AR p. 169 (Plaintiff reported she prepares sandwiches and sometimes complete meals).

[145] *See*, Adult Function Report, AR p. 170 (Plaintiff reported she shops for groceries in stores twice a month when her daughter brings her, and that her shopping usually takes 30-45 minutes).

[146] *See*, Adult Function Report, AR p. 171 ("I watch TV every day and my laptop about 2-3 times a wk.").

[147] *See*, Adult Function Report, AR p. 170.

[148] *See*, Adult Function Report, AR p. 170 (noting she drives "only if I have to go to doctor and have no other choice. Someone usually brings me.").

[149] *See*, Adult Function Report, AR p. 171 ("My children visit and talk to me.  We'll have dinner together and watch movies.").

[150] *See*, Adult Function Report, AR p. 172 (Plaintiff reporting that she follows written and spoken instructions well).

[151] AR p. 23.  The ALJ stated that "the record reflects work activity after the alleged onset date."  AR p. 23.  A review of the record indicates that Plaintiff's additional certifications and training in safety consultation as well as her employment with Beard occurred *prior* to the alleged disability onset date.  However, Plaintiff's medical records indicate substantially similar complaints and treatment both prior to and after the alleged onset date of October 25, 2012.  Accordingly, to the extent the ALJ's opinion regarding Plaintiff's credibility was informed by Plaintiff's ability to obtain certifications and employment while experiencing symptoms similar to those she now contends are disabling, this factor is not affected by the ALJ's incorrect statement that Plaintiff participated in work activity following her alleged onset date, and the ALJ's mistake in this regard was harmless error.  Under the harmless error rule, a judgment will not be vacated unless the substantial rights of a party have been affected.  Procedural perfection in administrative proceedings is not required and improprieties constitute a basis for remand only if they would cast into doubt the

The ALJ then explained that "even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence…."[152]  Plaintiff asserts that the ALJ's "comments following this conclusion fall short of substantial evidence and in fact are not supported by any evidence at all."[153]  Plaintiff focuses on the ALJ's statement that "[a]t times, the claimant has not taking [sic] narcotic based pain relieving medications in spite of allegations of quite limiting pain,"[154] and argues that her medical records reflect that she "was always taking significant amounts of medications including the 'narcotic based' medications the Judge would suggest are appropriate."  Plaintiff asserts that she "cannot find a single reference in the records that even suggests that the client should be limited to (or was limited to) over-the-counter pain medications" and concludes that "[t]he attacks on the claimant's credibility and the conclusions drawn by the Judge are simply not supported by **any** substantial evidence of any kind."[155]

In making her credibility determination, the ALJ explained that "[t]he claimant has not generally received the type of medical treatment one would expect for a totally disabled individual. Following her initial surgeries, the treatment the claimant has received has been essentially conservative and/or routine in nature."[156]  Further, the ALJ noted that "at times" Plaintiff was "not taking narcotic based pain relieving medications in spite of allegations of quite limiting pain."[157]

---

existence of substantial evidence to support the ALJ's decision.  *Mays v. Bowen,* 837 F.2d 1362, 1364 (5th Cir.1988)*; Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).

[152] AR p. 23.

[153] R. Doc. 10, p. 8.

[154] AR p. 23.

[155] R. Doc. 10, p. 9 (emphasis in Plaintiff's briefing).

[156] AR p. 23.

[157] AR p. 23.

Additionally, the ALJ explained that "[t]he record reveals that the claimant's allegedly disabling impairment was present at approximately the same level of severity prior to the alleged onset date" and that the "fact that the impairments did not prevent the claimant from working at that time strongly suggests that it would not currently prevent work."[158]  The ALJ noted that "the claimant was able to maintain attention and concentration to the degree required for participation at the hearing and interacted appropriately with the Administrative Law Judge and others present in the hearing room."[159]  Finally, the ALJ explained that

> The record does not contain any opinions from a treating or examining physicians [sic] indicating that the claimant is disabled from a physical aspect or even has limitations greater than those determined in this decision.  Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor.  Yet a review of the record in this case reveals no restrictions recommended by the treating doctor.[160]

Although Plaintiff's medical records reflect that she has consistently complained of pain to all of her medical providers, there is substantial evidence to support the ALJ's credibility determination regarding the limiting effects of that pain, especially in light of the "considerable deference" to which the ALJ's determination in this regard is entitled.  *Jones*, 829 F.2d at 527; *Johnson*, 864 F.2d at 347.  Following Plaintiff's initial fusion and removal procedure, Plaintiff's treatment regime has thus far consisted of medication and injections.  No physician has placed Plaintiff on any restrictions, and some of these physicians have apparently recommended therapy or exercise.[161]  Multiple objective tests before and after Plaintiff's alleged disability onset date

---

[158] AR p. 24.

[159] AR p. 24.

[160] AR p. 24.

[161] AR pp. 315-318 (Plaintiff's primary care physician recommending "regular exercise"); AR pp. 350-355 (Dr. Gawronski note indicating "Patient declined offer occupational therapy and neurosurgical evaluation until opportunity

have resulted in unremarkable or non-acute findings.[162]  Plaintiff's Adult Function Report indicates

that Plaintiff is able to engage in some activities, and despite apparently similar symptoms prior to

her alleged disability onset date, Plaintiff was previously able to obtain additional

schooling/certifications and work as a safety consultant for a three month period.[163]  Although the

records indicate Plaintiff has made multiple trips to the emergency room, she was ambulatory for

these visits.[164]  Records both before and after Plaintiff's alleged disability onset date reflect that

Plaintiff was able to climb onto the exam table and change positions smoothly.[165]  The records

reflect Plaintiff's relatively consistent weight throughout, despite her allegations of disabling

pain.[166]  *See*, *Falco*, 27 F.3d at 163 ("Falco exhibited no external manifestations of debilitating

---

to review her results at follow up."); AR pp. 505-506 (Dr. Gawronski note indicating "Patient declined offer [of] occupational therapy and neurosurgical evaluation until opportunity to review her results at a follow-up.").

[162] *See*, AR p. 518 (January 16, 2012 impression of lumbar spine "[e]ssentially unremarkable MR on lumbar spine. Mild spondylosis T12-L1.  Minimal disc bulge L3-L4."); AR p. 235 (February 2, 2012 Dr. Izasa note reflecting "overall the MRI does appear fairly benign."); AR p. 251 (March 14, 2012 Dr. Nesheiwat note reflecting "Tonya has quite a bit of pain, which is out of proportion to her lumbar MRI findings…."); AR p. 474 ("MRI scan dated 1-16-12 shows no significant pathology in her lumbar spine.  She also underwent x-rays of her hips and sacroiliac joints and both these are also normal.  X-rays of the thoracic spine shows a prior open reduction internal fixation of a left clavicle fracture, otherwise a mild scleotic curve in the thoracolumbar spine with convexity to the right."); AR 514 (January 2, 2013 X-ray of sacroiliac joints with normal impression); AR p. 507 (January 25, 2013 CT of lumbar spine reflecting "no fractures or malalignments of the lumbar spine," degenerative disc disease at T12-L1, bilateral facet joint mild osteoarthritis at L5-S1 with some associated ligamentum flavum hypertrophy, mild disc bulge at L5-S1, no abnormal enhancement intrathecally or in the paraspinal region, normal appearance of the bilateral sacroiliac joints); AR pp. 511-513 (normal impressions following March 7, 2013 x-rays of both hands and hips); AR pp. 509-510 (no acute findings following April 4, 2013 x-rays of both hands).

[163] AR pp. 198-202 & 146-147.

[164] AR pp. 329-332 (October 28, 2012 emergency room visit); AR pp. 324-328 (January 20, 2014 emergency room visit).

[165] AR pp. 252-255 (February 28, 2012); AR 250-251 (March 14, 2012); AR pp. 246-248 (January 2, 2013); AR pp. 243-245 (January 16, 2013).

[166] AR pp. 252-255 (weight recorded as 141 on February 28, 2012); AR pp. 250-251 (weight recorded as 140 on March 14, 2012); AR pp. 474-476 (weight recorded as 140 on March 28, 2012); AR pp. 304-309 (weight recorded as 125 on November 7, 2012); AR pp. 401-405 (weight recorded at 125 on December 12, 2012); AR pp. 246-248 & 315-318 (weight recorded as 131 and 127 on January 2, 2013); AR pp. 393-400 (weight recorded as 125 on January 11, 2013); AR pp. 243-245 (weight recorded as 132 on January 16, 2013); AR pp. 387-392 (weight recorded as 126 on February 13, 2013); AR pp. 381-386 (weight recorded as 126 on April 2, 2013); AR pp. 377-380 (weight recorded as 126 on May 8, 2013); AR pp. 373-376 (weight recorded as 123 on May 13, 2013); AR pp. 361-365 (weight recorded as 123 on July 31, 2013); AR pp. 356-360 (weight recorded as 123 on November 21, 2013); AR pp. 350-355 (weight recorded as 123 on December 3, 2013); AR pp. 324-328 (weight recorded as 121 on January 20, 2014).

pain such as marked weight loss."). Plaintiff testified that she did not use a cane, walker, or wheelchair, nor did she use a TENS unit.[167] Further, the ALJ had the opportunity to observe Plaintiff during the May 12, 2014 hearing, and although the ALJ initially questioned Plaintiff's demeanor,[168] the ALJ also noted in her ruling that Plaintiff was able to appropriately participate and interact during the hearing.[169] While Plaintiff questions the accuracy of the ALJ's determination that Plaintiff was, at times, not taking narcotic-based pain medications,[170] the record does reveal that Plaintiff had a period of time (which per Plaintiff was due to a lack of insurance) during which she did not see Dr. Isaza, and, in any event, the ALJ's credibility determination is not based solely on Plaintiff's prescription medication status. Accordingly, the ALJ complied with the applicable legal standard for assessing Plaintiff's credibility and adequately explained her reasons for finding Plaintiff's complaints of disabling pain not entirely credible.

**VI.    Conclusion**

The analysis above demonstrates that Plaintiff's claims of reversible error are without merit. The record considered as a whole supports the finding that the Commissioner applied the proper legal standards and substantial evidence supports the determination that Plaintiff was not disabled.

**<u>RECOMMENDATION</u>**

It is the recommendation of the magistrate judge that under sentence four of 42 U.S.C. § 405(g), the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin,

---

[167] AR p. 621.

[168] At the beginning of the May 12, 2014 hearing, the ALJ questioned Plaintiff about her demeanor, and Plaintiff responded that she was "really tired." AR p. 601. Plaintiff further asserted "I'm in my right state of mind. I'm just really tired." AR p. 601.

[169] AR p. 24.

[170] R. Doc. 10, p. 9.

34

denying the applications for disability insurance benefits filed by Plaintiff, Tonya Lee Sanchez, be

affirmed and this action be dismissed.

Signed in Baton Rouge, Louisiana, on July 13, 2017.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**